[No. H013671. Sixth Dist. Oct. 23, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS ALEXANDER HILL, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III., IV., V., VI. and VIII.

## COUNSEL

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Richard Rochman and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WUNDERLICH, J.—**

### I. *Statement of the Case*

Thomas Alexander Hill and Angela Yvet Tinsley (Tinsley) were jointly charged with five counts of forging checks. (Pen. Code, § 470.[1]) Defendant Hill (defendant) was separately charged with one misdemeanor count of concealing or destroying evidence. (§ 135.) It was also alleged that he had a prior serious felony conviction for robbery, which constituted a "strike" within the meaning of the three strikes law. (§ 667, subds. (b)-(i).)

Defendant appeals from the judgment entered after a jury convicted him of all counts, and the trial court found true the strike allegation. The court sentenced defendant under the three-strikes law to 10 years and 4 months in prison, with a concurrent 90-day jail term for the misdemeanor conviction.

On appeal, defendant claims the prosecutor violated his right to a fair trial by relying on and failing to correct demonstrably false testimony. He claims the trial court erred in instructing the jury not to consider why codefendant Tinsley dropped out of the case or whether she will be or has been prosecuted. He claims the trial court gave erroneous instructions on aiding and abetting and inadequate instructions on concealing or destroying evidence and erred in failing to instruct on attempting to conceal or destroy evidence. He also claims the court committed sentencing errors in doubling each consecutive sentence, imposing a one-year prison term enhancement, failing to stay the sentences for four of the forgery convictions, and basing the consecutive sentences on an improper circumstance.

Defendant also claims that defense counsel failed to provide effective assistance in numerous ways. He claims there is insufficient evidence to support his conviction for concealing or destroying evidence. He claims the three strikes law was improperly enacted as urgency legislation, violates his right to equal protection because it reduces the amount of conduct credit he can earn, and was inapplicable because his prior conviction predated its

---

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

enactment. Last, he claims the matter must be remanded for resentencing because the trial court erroneously believed it lacked discretion to strike his prior conviction.

We reverse defendant's misdemeanor conviction for concealing or destroying evidence. We also vacate the judgment and remand the matter for the court to consider whether to exercise its discretion to strike defendant's prior conviction. If it chooses to do so, then it shall resentence defendant; if it elects not to do so, then it shall reinstate the judgment as modified.

## II. *Facts*

On the evening of July 13, 1994, defendant and Tinsley went shopping at the Stanford mall. About 7:40 p.m., they stopped at Lady Foot Locker. According to Jocelyn Dufresne and Sherry Wyatt, who work there, Tinsley went to the "shoe wall" and selected a pair of $92 Air Max Triax running shoes. She asked to pay for them with a $100 American Express traveler's check. She also asked defendant if she should buy a Nike shirt. He said, " 'If you want it, get it.' " Tinsley took out another check, and they appeared to argue over who should sign the checks. She pushed them to him, but he refused and pushed them back. Wyatt said Tinsley looked surprised when asked for a driver's license. She produced it, and Dufresne showed her where to sign the checks. Dufresne was certain the checks were presigned. Both checks were numbered 235. The total bill was $112.57, and Defresne gave Tinsley $87.43 in change, which, according to Wyatt, defendant grabbed from her. Both left looking happy.

Dufresne thought it strange a local person would use traveler's checks and not know where to sign them. Also, the checks felt strange and had the same number. She phoned American Express, and security personnel had her test for counterfeits. The checks failed, and Dufresne called security and the police.

Meanwhile, defendant and Tinsley entered The Athlete's Foot, staffed by April Gordon. About 8 p.m., Tinsley bought a Nike hat defendant wanted and paid with a presigned $100 traveler's check, No. 226.

From there, defendant and Tinsley went to the Gap, which has two levels. On the lower level, Tinsley bought a pair of shorts for $21.64 from salesperson Kimberly Ventre using a presigned $100 traveler's check, No. 226. Ventre gave Tinsley $78.36 in change. On the upper level, Tinsley bought a $19 vest from salesperson Katherine Bush. She said it was a present for her sister and asked for a gift box. She paid with a presigned $100 traveler's

check, No. 226. Bush gave Tinsley $78.36 in change. Defendant and Tinsley left around 8:22 p.m.

After the Gap, it was Armani Exchange. Defendant selected a pair of jeans and a shirt for himself and Tinsley paid $80.11, using a presigned $100 traveler's check, No. 235, and $0.11 from defendant. Tinsley told the salesperson Carol Choi the items were a present for defendant. The two shoppers left the store and went to a car.[2]

Alerted by the call from Dufresne, mall security observed Tinsley and defendant exit the shopping center. Tinsley was aware they were being followed. Officer Cynthia Gill-Blanco of the Palo Alto Police Department saw mall security following Tinsley's car and then took over the pursuit. Before stopping it, she saw defendant throw a wad of paper out onto the street. Defendant and Tinsley were arrested after the stop. Police recovered the wad of paper, which turned out to be torn pieces of traveler's checks. In Tinsely's car, Gill-Blanco found all of the merchandise and sales receipts. Tinsley had no money on her person. Defendant was carrying $603 in cash, some of it in three groups of folded bills, whose amounts corresponded to the change given Tinsley after the two Gap sales and the Lady Footlocker sale. Later, at the police station, defendant said that $197 of the money was his and asked when he could have it back.

Officer Paul Van Dalen interviewed defendant at the station. At that time, defendant said a friend named Kevin Shauffner gave him the traveler's checks to pay off a debt. Defendant could not remember what the debt was for. Nor could he provide Van Dalen with any information about Shauffner. He said he had Tinsley sign them because he did not have any identification. Although he denied knowing the checks were counterfeit, he admitted thinking the checks were the reason police stopped him and Tinsley. He declined to elaborate further.

Van Dalen asked why defendant had Tinsley use a $100 check to buy a $9.99 hat instead of paying with change from the previous purchase. He gave no reason. When asked why he used a new check for every purchase, he said he wanted to get rid of them. He did not elaborate on this, nor was he asked to do so.

Van Dalen took notes during the interview, prepared a report, and then destroyed his notes. The next day, after reading Van Dalen's report, Officer Mark Wynne interviewed defendant. He said Tinsley picked him up and

[2]Defendant testified that before they went to Armani Exchange, Tinsley purchased additional merchandise from Eddie Bauer.

invited him to go shopping. They went to five stores, and he hung around while she bought things for him and herself. She paid with traveler's checks, and when people began to examine them closely, he realized something was "wrong."

Defendant told Wynne he had lied to Van Dalen about getting the checks from a friend, explaining that he did not like Van Dalen and wanted to help Tinsley. He really knew nothing about the checks except that Tinsley had them with her. He said he was also trying to help her when he tore up the remaining checks and discarded them. He said he suspected something was wrong.

Walter Green was in custody on July 13 and shared a jail cell with defendant. According to Green, defendant said he had been arrested for passing counterfeit American Express traveler's checks. Green explained that defendant said he had 10 $100 original checks, from which he made $50,000 worth of copies using a "laser printer" that he and a woman named Tinsley knew about. Defendant kept the originals and copies somewhere in his mother's house. Green further explained that defendant would have three girls, including Tinsley, buy inexpensive merchandise, which they could keep, and he would take the change. Defendant told Green checks were passed at a Blockbuster Video, a Foot Locker, and a Safeway. Defendant also mentioned the San Antonio Shopping Center and Stanford Shopping Center, where he was caught. He bragged of making up to $6,000 per day with this scam.

Green said that defendant was "stressed out" and seemed "desperate," constantly phoning people to find Tinsley because she knew the whole scam and he wanted to coordinate their stories. Defendant said Tinsley had nothing to lose because she had no criminal record and therefore she should take "the rap." Green also said defendant called a man named Tozier, which he referred to as a "street name." According to Green, defendant told Tozier to pick up some checks from his mother's house. He then called his mother to inform her that someone was coming to pick them up.

Green said he did not talk to the district attorney about his testimony, no one had asked him to testify, and no one had promised him anything for testifying. He had served his time for the crime he was in custody for when he and defendant were in jail together, and he informed on defendant out of his civic duty and because defendant threatened him with bodily harm. He said he and defendant argued, and at one point out of fear, he demanded to be moved. Later defendant tried to encourage other inmates to beat him up for providing information. Green admitted that at the time he testified he was in custody for a subsequent burglary.

Defendant's mother, Mary Robinson, testified concerning three authentic traveler's checks. Two of them were made payable to "Thomas Hill," defendant's father, and one, which was dated July 13, 1994, signed and cosigned with the name "Wanda Hill," was made out to Mary Robinson and endorsed on the back with a signature of Mary Robinson. As to the latter check, she said defendant gave it to her on July 13 to pay his rent and she cashed it the same day. At first she said the name on the front was her signature but later said she signed only the back. She did not know who signed the names on the front or dated the check.

Robinson also gave conflicting and confusing testimony about the check.[3] She said that on July 13, she told defendant he owed her money "and then he went and got the traveler's checks." She also said he told her he had been paid for work, showed her $300 in cash, and said he would pay the $100 he owed her but wanted to get traveler's checks. They drove to Redwood City, picked up a fellow union member Gail Kelly, and then went to the Bank of America, where she had an account. In the parking lot, defendant gave her a traveler's check, she went inside and cashed it, drove defendant back home to Palo Alto, then drove herself and Kelly back to Redwood City for a union banquet.

Robinson said she could not recall where defendant got the traveler's check but was "pretty sure" he got them at a bank. At one point, she said she bought the traveler's checks. She then denied buying them. She said she did not know who bought them. She then said she drove defendant to the bank, he went in and bought them, came out, gave her one, and she then went inside and cashed it. She did not notice that the check was signed and cosigned by a person named "Wanda Hill"; nor did she know anyone by that name. She could not explain why defendant paid her with a check instead of the cash he used to buy the checks. On cross-examination, she said she did not see defendant buy any checks or know whether he did so or where the checks actually came from. All she knew was that he paid her with a check. She also said that defendant did not own any copying equipment.

### Tinsley's Defense

Tinsley testified that irregularly over the last few years, she and defendant spent time together. They were never romantically involved, but he treated her like a "queen" anyway, taking her to an expensive restaurant in San Francisco, buying her things, and giving her money. She considered him an "associate" but not a friend in whom she might confide.

---

[3]Robinson also testified outside the presence of the jury concerning how she obtained the check.

After not seeing him for more than a year, he called in July 1994 and asked her out. At the time, she had no income, lived at home with her mother, and had a boyfriend. A few days later, on July 13, he called again. They arranged to go shopping at a mall, get propane gas for her car, and then drive to San Francisco for dinner. She picked him up and drove to the Stanford mall. Defendant gave her an envelope, in which were five $100 traveler's checks. He wanted her to use them to buy clothes for a trip he was making. To help him, she had made sure she brought along her driver's license. She did not know the checks were counterfeit, and she did not ask where they came from because she trusted defendant.

They bought nothing for a couple of hours and then found things to buy during their last 45 minutes at the mall. In the Foot Locker, Tinsley saw shoes and a shirt, and defendant offered to buy them. They argued about the shirt, and she paid using two of defendant's traveler's checks. She had never used them before, and the salesclerk showed her where to sign and asked for identification. She was certain she signed both the top and bottom of the checks. From there, they went to The Athlete's Foot, defendant picked out a hat and she paid for it with another check, again signing both the top and bottom. They also went to Eddie Bauer and Armani Exchange. After every purchase, she gave defendant the change because the money was his. She did not consider it strange to be using new checks for every purchase instead of the change. Nor did she consider it wrong to be signing someone else's traveler's checks.

She denied she bought the vest as a present for her sister and claimed the salesperson lied about this. However, she admitted she does not usually have clothes for herself put in gift boxes. She also denied saying the pants and shirt were a present for defendant and claimed that salesperson lied.

When confronted with *seven* checks having her signature and evidence that the envelope discarded by defendant contained two checks, Tinsley remained certain the envelope originally contained only five checks. She said defendant must have put the other two in the envelope before throwing it from the car. However, she did not see him do this. She could not explain how the two checks got signed and denied presigning any checks. She claimed that all of the salesclerks were lying about this to avoid getting into trouble. She also said Wyatt lied about her being surprised when asked for identification. She brought her license specifically to show for identification. She also said Dufresne lied about her and defendant having an argument about signing the checks.

Tinsley said that after they finished shopping, she thanked defendant for the presents and they returned to her car. There were no checks left in the

envelope, and she gave it back to defendant. They figured the propane gas station was probably closed and decided against going to San Francisco. Tinsley drove out of the parking lot with her radio on and the volume turned up. She saw a police car behind her and turned the music down. Defendant ripped up what she thought was the empty envelope, opened the door, and threw it out. When she was pulled over, she thought it was for her loud music.

Tinsley said that when she first spoke to Officer Van Dalen on July 13, she told him the truth. However, after defendant threatened her over the phone on July 14, she told Van Dalen a different, false story. She did not report the threat. Tinsley said she also felt threatened because she heard that some strange people were coming to her father's house. Months later, after talking to her father, she decided to tell the truth again.

Tinsley's sister Cheryl testified that very shortly after his arrest, defendant called her collect, looking for Tinsley. He said he wanted them to "get their stories straight" and asked her to tell Tinsley to call his mother so that "she would tell her what to say" and "she would be taken care of." The next time he phoned, she did not accept the call. He called her again and explained that Tinsley had done him a favor by signing the checks and did not know they were counterfeit. She did not have anything to worry about because he was taking "the rap" and she would "get off clean." He called three more times, but she did not accept the calls.

After Tinsley testified but before defendant testified, she pleaded guilty to two counts of forgery and was placed on probation for three years on condition she serve a four-month jail term. The trial proceeded against defendant.

### Defendant's Defense

Defendant testified that he has known Tinsley since 1989. In July 1994, he and Tinsley bought propane gas in Hayward for her car and then went to a park. They went out again some days later. On July 12, she paged him, and he met her at a Seven-Eleven store sometime after midnight. Tinsley was with a girlfriend named Wanda. He and Tinsley went to a furniture store to talk. He asked her for money to buy a chain saw for work. She said it was too late to go to the bank so she gave him three American Express traveler's checks. At trial, he identified the three authentic traveler's checks signed by Wanda Hill as the ones she gave him. He said he was suspicious about these checks from the start.

Defendant said he gave one of the checks to his mother because he owed her money and she was upset about it. He told her to sign it, and the next day

he went with her to a bank in Redwood City to make sure she could cash it. He gave the other two checks to his father, Thomas Hill, to pay for his phone bill.

On July 13, Tinsley called him again. They arranged to go out together, and she came by and picked him up. They stopped at some shoe stores but could not find what she was looking for and drove to Stanford mall. They went to the Foot Locker, and Tinsley bought a pair of shoes using a traveler's check. She gave him the change to hold for her. From there they went to The Athlete's Foot, where she bought him a hat he liked, again using a traveler's check. She gave him the change to hold. They proceeded to the Gap, and Tinsley bought some shorts and a vest with traveler's checks. Then, they went to Eddie Bauer, where Tinsley bought shorts with another check and gave the change to him. Last, they went to Armani Exchange. Tinsley bought him jeans and a shirt with a check and gave him the change. He thought it strange Tinsley said the clothes were a birthday present because she knew it was not his birthday.

Defendant said they left the mall and returned to Tinsley's car. He started to notice security guards. Tinsley said they must think they stole something. He said they could "put nothing off on us." They left, and defendant noticed Tinsley get worried when a police officer passed them. She was holding other traveler's checks in her hand, and he asked her if they were "going to get jacked." She handed the checks to him, and he asked if they were "hot." He then tore them up and threw them out of the car. Thereafter, they were stopped by the police officer following them.

Defendant said his explanation to Van Dalen was the same as his trial testimony. However, after Van Dalen talked to Tinsley, he came back and accused him of lying and said, "I'm going to make sure you go down for this." Van Dalen then tore up his original notes and fabricated the Kevin Shauffner story. Defendant denied saying the counterfeit checks were his or knowing where they came from. He also denied saying he wanted to "get rid of" the checks and that he had Tinsley sign them because he lacked identification. Defendant also claimed his explanation to Officer Wynne was the same as his testimony. He could not say why the officers altered his statements to them.

Defendant admitted that in the jail cell, he told Green he had been arrested for forgery and may have mentioned the names Tozier and Tinsley. However, he said Green fabricated the rest. He denied telling Green anything about passing checks at various stores with female accomplices, using a laser printer, or copying $50,000 worth of checks. He admitted calling a man

named Tozier, who was his parole officer. He denied knowing anyone named Monica Johnson, Wanda Hill, or Wanda Wilson. He said that after his arrest he called Tinsley because she had gotten him in trouble and he wanted to find out why he had not been released. He denied threatening her or asking her to lie for him. He admitted speaking to Tinsley's sister but denied threatening her.

Defendant said his mother's testimony was confused because she wanted to protect him. He said the prosecutor knew that the checks had been purchased in San Leandro and not Redwood City but had succeeded in getting his mother to lie. Defendant also said the salesclerks lied about him arguing with Tinsley about who would sign the traveler's check.

## III.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . .

### VII. *Concealing or Destroying Evidence*

Defendant contends there is insufficient evidence to support his misdemeanor conviction for violating section 135, which provides, "Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor."

■ Defendant claims that to violate this section, one must render the evidence unavailable. (See, e.g., *People* v. *Fields* (1980) 105 Cal.App.3d 341 [164 Cal.Rptr. 336] [marijuana flushed down toilet].) He argues that where, as here, the evidence is recovered and available at trial, one is at most guilty of attempted concealment or destruction.[9] The People claim section 135 is violated when one "alter[s] the ordinary course of the investigation, by removing the evidence from the place we should expect the investigation would have discovered it." We partially agree with both parties.

■ Section 135 must be construed according to the fair import of its terms, with a view to effect its objects and to promote justice. (See *People* v.

---

*See footnote, *ante*, page 1078.

[9]As noted, defendant admitted that while being followed by a police officer, he intentionally tore up the remaining traveler's checks and tossed them from the car because he suspected they were the reason he and Tinsley were being followed. Officer Gill-Blanco saw the wad of paper being discarded. Police later recovered it, and the torn checks were introduced into evidence at trial

*Morris* (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-545 [37 Cal.Rptr.2d 446, 887 P.2d 527].) Our principal task is to ascertain the intent of the Legislature. (*People* v. *Broussard* (1993) 5 Cal.4th 1067, 1071 [22 Cal.Rptr.2d 278, 856 P.2d 1134].) We focus first on the words of the statute and, giving them their ordinary meaning, determine whether they unequivocally express the Legislature's intent. "If no ambiguity, uncertainty, or doubt about the meaning of the statute appear, the provision is to be applied according to its terms without further judicial construction. [Citation.]" (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46]; *Arnett* v. *Dal Cielo* (1996) 14 Cal.4th 4, 24 [56 Cal.Rptr.2d 706, 923 P.2d 1].) However, the words should not be read literally if doing so would result in absurd or unintended consequences. (*People* v. *Broussard, supra*, 5 Cal.4th at p. 1071.) "In such circumstances, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.]" (*Ibid.*)

 The purpose of section 135 is to prevent the obstruction of justice. (See *People* v. *Newton* (1963) 222 Cal.App.2d 187, 189-190 [34 Cal.Rptr. 888].) The plain meaning of "destroy" is to ruin something completely and thereby render it beyond restoration or use. (See Webster's New Internat. Dict. (3d ed. 1981) p. 615.) Under this definition, if one destroys evidence, it necessarily becomes unavailable and cannot be produced. Conversely, if, despite one's efforts, the evidence is or can be restored and used, then, by definition, it has not been destroyed; rather, such efforts constitute an attempt: a direct, but ineffectual, act toward the commission of a crime. (See *People* v. *Edgar* (1963) 60 Cal.2d 171, 174 [32 Cal.Rptr. 41, 383 P.2d 449]; see, e.g., *People* v. *De Felice* (1953) 282 A.D. 514 [125 N.Y.S.2d 80] [dicta that separating barrel from gunstock, cutting up the barrel, and separately disposing of both represented concealment and attempted destruction].)

Since the common meaning of "destroy" is reasonable and applying it is consistent with and promotes the purpose of the statute, we decline to give it a broader or narrower construction. Moreover, the plain meaning does not lead to absurd or unintended consequences. Together, the statute and the proscription against attempts (§ 664) reach any and every direct act taken to destroy evidence committed with the requisite intent, regardless of whether the acts succeed. This construction also maintains a clear line between committing and attempting to commit the offense by acts of destruction.

Turning to the facts, we note that defendant tore the checks and tossed them from the car with the intent to prevent them from being produced. However, he did not ruin them completely or render them beyond restoration

or use. Indeed, they were easily reassembled and admitted into evidence at trial, and thus were no less useful for having been torn. Thus, there is insufficient evidence to support his conviction on the theory he destroyed the checks. At most, the tearing of checks was an attempt to destroy them.

Defendant's claim that concealment under the statute must have the same effect as destruction—permanent unavailability—is less convincing. The ordinary meaning of "conceal," its context, and the purpose of the statute do not support this assumption.

The word "conceal" simply means to hide or cover something from view. (Webster's New Internat. Dict., *supra*, at p. 469.) Section 135 proscribes concealing evidence "about to be produced in evidence upon any trial, inquiry, or investigation." Given its plain meaning, "conceal," in context, does not necessarily or reasonably suggest that a defendant must render evidence permanently unseen, or as defendant submits, unavailable. Rather successful concealment of evidence from a particular investigation is sufficient.

Moreover, we must view the term in context and in light of the purpose of the statute. One can obstruct the administration of justice in varying degrees and in a variety of ways. Obviously, to permanently conceal evidence is a substantial obstruction of justice. To a lesser degree is any act of concealment that interferes with, impedes, frustrates, or unnecessarily prolongs a lawful search.

For example, a thief eludes the police and buries his booty in a neighbor's backyard. Police arrive and search him and his property but find nothing. The next day, a neighbor leads them to freshly tilled earth in his yard, and they dig up the stolen property. Has the thief violated the statute or merely attempted to do so? Given the ordinary meaning of "conceal," the purpose of the statute, and its applicability to *any* investigation, the thief has, in our view, violated the statute: his conduct successfully hid stolen property from view during the first search of him and his property and thereby impeded, frustrated, and prolonged an investigation of the theft.

It follows from our analysis, however, that where a thief does not interfere with, impede, frustrate, or prolong a lawful investigation, for example, where a thief is interrupted while concealing evidence or where the police watch him conceal it, he has not successfully hidden the evidence or appreciably affected an investigation and thereby obstructed justice. He has merely tried to do so. Thus, his conduct constitutes an attempt to violate the statute by concealment.

This point is illustrated in *People* v. *Superior Court* (*Reilly*) (1975) 53 Cal.App.3d 40 [125 Cal.Rptr. 504], which both defendant and the People cite to support their respective positions. In *Reilly*, the defendant was unaware that an officer was watching him, through the window, take a wallet from plain view and put it in a desk drawer, put photographic material and a driver's license in a brown box on the floor, and bring a black container for traveler's checks into the bathroom. (*Id.* at pp. 44-45.) In upholding the seizure of this evidence, the court, in dicta, opined that ". . . it is a criminal offense to destroy or conceal evidence. [Citations.] Here, . . . there was an *attempt* to conceal the evidence witnessed by the officers. It would be incongruous to prohibit the officers from seizing evidence of the misdemeanor which was committed in their presence, while at the same time upholding their right to arrest the perpetrator." (*Id.* at p. 49, italics added.)

As with "destroy," the plain meaning of "conceal" is reasonable, and applying it is consistent with the purpose of the statute and does not lead to absurd consequences. Moreover, our analysis of its meaning in context again maintains a clear line between committing the offense and attempting to do so by concealment: whether the act of concealment appreciably interfered with an investigation, inquiry, or trial and thereby obstructed justice.

The facts here are similar to those in *Reilly*. In full view of the police, defendant abandoned the torn checks by throwing them from the car. Clearly, he did not succeed in hiding or covering this evidence; nor did he appreciably affect the investigation of suspected counterfeiting. An officer simply walked over to the discarded evidence and collected it. Thus, there is insufficient evidence to support defendant's conviction on the theory he concealed the checks. At most, abandoning them in front of the police was an attempt to conceal them.[10]

In sum, we conclude that there is insufficient evidence to support a conviction. Consequently, that conviction must be reversed.[11]

---

[10]Given our discussion, we agree with defendant's related claim that the trial court erred in failing to instruct the jury on the lesser included offense of attempted concealment or destruction of evidence. (See *People* v. *Avena* (1996) 13 Cal.4th 394, 424 [53 Cal.Rptr.2d 301, 916 P.2d 1000] [sua sponte duty to instruct on lessers when there is substantial evidentiary support for instruction].) However, since we reverse defendant's conviction on other grounds, we need not discuss whether this error was prejudicial.

[11]Under principles of double jeopardy, our reversal due to insufficiency of evidence bars retrial for the offense. (See *People* v. *Superior Court* (*Marks*) (1991) 1 Cal.4th 56, 72 [2 Cal.Rptr.2d 389, 820 P.2d 613].) Thus, we do not address defendant's claim that the court erred in failing to instruct on an element of the offense.

We acknowledge that double jeopardy would not bar a subsequent prosecution for attempted concealment or destruction of evidence. However, under the circumstances,

## VIII. *Sentencing Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IX. *Disposition*

Defendant's misdemeanor conviction for concealing or destroying evidence is reversed. The clerk of the superior court is directed to modify the judgment to reflect an acquittal on that charge. As modified, the judgment is vacated and the matter remanded for the court to consider whether to exercise its discretion to strike defendant's prior conviction. If it chooses to do so, then it shall resentence defendant and enter a new judgment; if it elects not to do so, then it shall reinstate the judgment as modified.

Premo, Acting P. J., and Elia, J., concurred.

A petition for a rehearing was denied November 21, 1997, and appellant's petition for review by the Supreme Court was denied February 18, 1998.

---

prosecution for this misdemeanor seems only a theoretical possibility. Thus, we decline to propound dicta concerning the elements of this misdemeanor.

*See footnote, *ante*, page 1078.