Filed 7/5/16  P. v. Montoya CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041874 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS121892A) |
| v. | |
| EDWARD JAMES MONTOYA, | |
| Defendant and Appellant. | |

## I.  INTRODUCTION

Defendant Edward James Montoya was convicted after jury trial of conspiracy to commit sexual battery (Pen. Code, §§ 182, 243.4, subd. (e)(1))[1] and misdemeanor destroying or concealing evidence (former § 135).  The court suspended imposition of sentence and placed defendant on probation.

On appeal, defendant first contends that his conviction for conspiracy to commit sexual battery must be reversed because there is no evidence of an agreement to touch the victim without her consent.  According to defendant, the evidence at trial supported a finding that he agreed with a friend to impersonate the friend in order to obtain the victim's consent to touch her sexually.  Defendant argues that where a victim's consent to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

a sexual touching is obtained by impersonation, no sexual battery has occurred and therefore he may not be convicted of a conspiracy to commit a sexual battery.

Second, defendant contends that his conviction for destroying or concealing evidence (former § 135), which was based on his deletion of text messages from his cell phone, must be reversed. Defendant argues that former section 135 did not provide fair warning that such conduct was proscribed, and he did not destroy or conceal the text messages within the meaning of the statute.

For reasons that we will explain, we will affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Information*

In June 2013, defendant and Michael David McClintic were charged by second amended information with conspiracy to commit sexual battery (§§ 182, 243.4, subd. (e)(1); count 1) and misdemeanor sexual battery (§ 243.4, subd. (e)(1); count 2). Defendant was also charged with misdemeanor destroying or concealing evidence (former § 135; count 3).

### B. *The Jury Trial*

The trial initially began as a joint trial of defendant and codefendant McClintic. After the prosecution presented most of its case, McClintic entered into a plea bargain and pleaded no contest to misdemeanor sexual battery (count 2). He thereafter testified at defendant's trial.

#### 1. The prosecution's case

Jane Doe was 25 years old at the time of trial in 2014. On the night of September 29, 2012, Doe was at a bar with a group of friends, including a friend named Martha. Defendant was at the bar with codefendant McClintic. Defendant and McClintic knew each other from high school, where they had graduated in 2006.

2

While at the bar, Doe talked to McClintic, and Martha talked to defendant. Doe and her friends, as well as defendant and McClintic, were drinking that night. Doe was not interested in defendant and never expressed an interest in having sex with defendant.

In the early morning hour of September 30, 2012, Doe and McClintic left the bar together in a cab and ended up at defendant's residence. Doe initially believed it was McClintic's house. Doe testified that the residence was not very big and had only one bedroom.

At 1:09 a.m., Doe texted the address of the residence to Martha, so Martha could deliver an overnight bag from the car that Doe had taken to the bar. Doe was happy and having a good time with McClintic. Doe had consensual sex with McClintic in the bedroom.

At 2:06 a.m., McClintic engaged in a series of back-and-forth texts with defendant while Doe was at the residence. McClintic indicated to defendant that he had had sex with a female in defendant's bed and was trying to get rid of her. McClintic stated that he would explain when defendant returned, and McClintic asked how long it would be until defendant came back. Defendant did not indicate when he would return.

At 2:26 a.m., Doe and Martha exchanged texts about how McClintic looked.

At 2:28 a.m., McClintic engaged in a second series of texts with defendant. McClintic asked defendant for his estimated time of arrival. Defendant indicated 10 minutes, and McClintic told him to hurry up. McClintic told defendant to text him when defendant was "out front," and that he had "an idea." McClintic also asked whether defendant had a condom, and defendant responded affirmatively. McClintic eventually texted that he had "an excellent plan" and asked defendant, "Where you at?" After defendant indicated that he had arrived, McClintic texted him, "Hold up," "I'll be right out," and "Stay outside."

3

At trial, McClintic testified that his "idea" was that defendant could "come and have sex with" Doe. McClintic testified that he never asked Doe if she was willing to have sex with defendant.

At the residence, McClintic told Doe that he was going to the bathroom and said, "Stay here," in reference to the bed. McClintic left the bedroom, and minutes later Doe also left the bedroom. On her way to the kitchen, Doe saw the bathroom but McClintic was not there. McClintic was outside and Doe saw him enter the residence. McClintic told her, "Go to the bedroom. Don't say anything. Don't look at me." Doe thought that that might have been "what he was into" regarding sex.

There were no lights on in the residence. Doe went back to the bedroom with her cell phone nearby.

McClintic testified that when he went outside, he saw defendant. McClintic testified that he sent defendant into the room to pretend to be McClintic, that he told defendant this, and that defendant knew what he was doing. McClintic testified that he never told defendant that Doe agreed to have sex with defendant. McClintic waited in the kitchen while defendant went into the bedroom.

Defendant got into the bed with Doe without saying anything. Doe initially thought McClintic had gotten into the bed with her, but the person felt "different" to her. Both defendant and Doe were naked. Doe felt defendant against her back and his penis against her body. Defendant touched her breasts and shoulders, and used his hands to touch her vagina. Doe grabbed her cell phone to light up the person's face and saw that it was defendant and not McClintic. Doe told defendant to stop and to leave her alone.

McClintic testified that defendant was in the bedroom for "[m]aybe a minute," before McClintic heard Doe "freaking out, yelling, cussing." She said, "Do you think I'm stupid?"

Doe never agreed for this to happen and did not want to have sex with defendant. She was scared and "freaked out." Doe testified that "[a]t first [defendant's] face was

4

somewhat of like shock and amusement. And then a few seconds later Mr. McClintic popped out and they were laughing like it's okay." Doe told them, "It's not okay." McClintic initially had "sort of the same reaction" as defendant, "like, oh, fuck, we got caught. Ha, ha, ha." However, neither defendant nor McClintic seemed sorry or ashamed. Doe testified that during this time frame, McClintic said to her, "Just let him put it in." Doe testified that her response was "[n]o."

McClintic testified that the "plan" was for defendant to have sex with Doe. According to McClintic, "[defendant] underst[oo]d that was the plan," and "[defendant] kn[e]w she didn't consent." McClintic testified that ultimately the "plan didn't work." McClintic acknowledged that he never asked Doe if she was willing to have sex with defendant, nor did McClintic otherwise ask Doe for consent.

Doe testified that she called or texted Martha and other friends. Doe's phone records indicate that she called Martha at 2:28 a.m. Doe let Martha know what happened and asked for Martha to come get her.

At 2:53 a.m., Martha texted to Doe, "On our way."

At some point, McClintic and defendant became upset because Doe was making phone calls. Doe told them that she was going to call the police, and they also said they were going to call the police. Doe believed McClintic called a cab. The same cab driver who had initially taken them to the residence showed up again. Defendant and McClintic tried to force Doe out of the house. Doe believed that they threw the bag that her friend had earlier dropped off out of the house. Doe did not go with the cab driver because she did not trust the driver and she had already called Martha. Doe told defendant she was not going to leave until her friends arrived.

At 3:10 a.m., while she was still at the residence, Doe called Monterey County Sheriff's Officer Darlington, with whom Doe was friends. Doe told him that she was being asked to leave a residence and asked whether she had to leave.

5

At 3:16 a.m., Martha texted to Doe, "We outside." Doe met with Martha and called 911. Monterey Police Officer Kris Richardson arrived within approximately 15 minutes. The officer talked to Martha and then to Doe. Doe still felt drunk but she knew what she was saying. After speaking with Officer Richardson, Doe went to the hospital for a medical examination.

Officer Richardson contacted defendant by phone around 7:00 a.m. and said that he needed to speak with defendant. Defendant arrived at the Monterey Police Department with McClintic around 8:00 a.m.

Officer Richardson spoke with McClintic first. During the interview, the officer obtained McClintic's cell phone. The officer saw the two series of text messages between McClintic and defendant. McClintic was ultimately arrested, and the officer interviewed defendant shortly thereafter.

Officer Richardson began his interview with defendant by advising him of his *Miranda* rights.[2] Defendant denied sexually assaulting Doe and allowed the officer to look through his phone. Officer Richardson did not see defendant's text exchanges with McClintic on the phone. Defendant initially denied having any text communications with McClintic. At one point, when the officer read from a notepad the text messages he had gotten from McClintic's phone, defendant denied that the officer was telling the truth and denied receiving the texts or knowing what they were about. Defendant eventually indicated that he had deleted the texts from McClintic prior to going to the police department.

### 2. The defense case

Defendant testified in his own behalf. At the time of trial in 2014, defendant was 26 years old. Defendant and McClintic were friends who had known each other since high school. During the time period at issue, McClintic was visiting and staying with

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

6

defendant. Before McClintic left the bar with Doe, defendant gave him the key to defendant's apartment.

Defendant testified that as he was getting ready to leave the bar, he got a text from McClintic at 2:06 a.m. Defendant felt it was "not respectful" for McClintic to have sex in defendant's bed. According to defendant, he then went to get something to eat and ultimately walked home, which took at least 20 or 30 minutes. Defendant testified that he did not know what McClintic meant in the second series of text messages at 2:28 a.m. when McClintic texted about having an idea, asked whether defendant had a condom, and told defendant to let McClintic know when defendant arrived home.

Upon arriving at his residence, defendant texted McClintic to let him know that he was outside. Defendant could not enter the residence because he had earlier given the key to McClintic. After defendant was inside the residence, McClintic told him, "Hey, she's over in the bed. She might be willing to have sex with you." Defendant testified that he was "dumbfounded," that he did not respond, and that he walked toward his room. He heard Doe in the room say, "What the fuck?" Defendant turned on the light, and Doe said, "What the hell is going on?" Defendant told Doe that she needed to get her stuff and go. Defendant was upset because he realized that McClintic did in fact have sex in defendant's bed.

Defendant testified that he had his clothes on while Doe was at the residence. He also testified that he never touched Doe. He further testified that he did not know about McClintic's plan and that he never agreed to be part of McClintic's plan.

Doe initially refused to leave the residence. She eventually left at approximately 3:16 a.m. Defendant went to sleep in his bed and McClintic slept on a sofa.

About 7:00 a.m., defendant received a call from Officer Richardson, who wanted defendant to come to the police station. Defendant went to the police station with McClintic. The officer spoke with McClintic and then with defendant.

7

Defendant testified that he told Officer Richardson that he did not remember whether he had earlier received texts from McClintic. Defendant eventually acknowledged to the officer that there were text messages with McClintic. Defendant was arrested after he spoke to the officer.

At trial, defendant initially testified that he deleted all his text messages after Doe left the residence and before he went to bed. He claimed that he deleted text messages all the time because his iPhone 4 did not have much memory. He later testified that he did not remember when he deleted the messages, and that he might have deleted them when he first woke up in the morning. He subsequently testified that he deleted the texts sometime between 3:30 a.m. and 7:00 a.m.

## C. *The Verdicts and Sentencing*

The jury indicated that it had reached verdicts on the conspiracy and the destroying or concealing evidence counts (counts 1 & 3), but not the sexual battery count (count 2). Upon motion of the prosecution, count 2 was dismissed. The jury found defendant guilty of conspiracy to commit sexual battery (count 1) and destroying or concealing evidence (count 3).

Defendant filed a sentencing memorandum and "motion to strike [the] verdict." Defendant contended that he could not be convicted of conspiracy to commit sexual battery. He argued that "[o]btaining consent to touch the genitalia by impersonation does not violate section 243.4, sexual battery." Defendant also contended that the deletion of texts from his cell phone did not support a conviction for destruction of evidence because the texts were recovered from McClintic's phone.

In a written response, the prosecution contended that a conspiracy to commit sexual battery had been established because the two defendants planned and acted to touch Doe in a sexual manner without her consent or knowledge. The prosecution also argued that defendant deleted "an inculpatory text conversation" with McClintic and denied its existence. The prosecution contended that the officers' ability to reconstruct

8

the conversation through another avenue – that is, from McClintic's phone – did not preclude defendant's conviction for concealing evidence.

At the sentencing hearing, the trial court denied defendant's motion to strike the verdict. The court suspended imposition of sentence and placed him on probation for three years with various terms and conditions, including that he serve 229 days in jail, with 229 days custody credit.

## III.  DISCUSSION

### A. *Conspiracy to Commit Sexual Battery*

#### 1.  The parties' contentions

Defendant contends that his conviction for conspiracy to commit sexual battery must be reversed for insufficiency of the evidence. According to defendant, the evidence at trial supported a finding that he agreed to impersonate McClintic in order to obtain the victim's consent to touch her sexually. Defendant argues that sexual battery requires a non-consensual touching, and that consent obtained by impersonation does not satisfy this element. Defendant contends that he therefore cannot be convicted of conspiracy to commit sexual battery.

The Attorney General contends that there was evidence that defendant "intended to agree and did agree to commit a sexual touching of Jane Doe without her consent."

#### 2.  General legal principles

" 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, *as well as the specific intent to commit the elements of that offense*, together with proof of the commission of an overt act . . . .' [Citations.]" (*People v. Johnson* (2013) 57 Cal.4th 250, 263-264.) A defendant is guilty of misdemeanor sexual battery under section 243.4, subdivision (e)(1), if the defendant touches an intimate part of another person for a sexual purpose and "the touching is against the will of the person touched." In the sexual assault context, including sexual battery under section 243.4, subdivision (e)(1), "it is settled that

9

' "without the victim's consent" ' has the same meaning as ' "against the victim's will." '
[Citations.]" (*People v. Robinson* (2016) 63 Cal.4th 200, 208 (*Robinson*).)

### 3. Analysis

In this case, we determine that there is substantial evidence to support defendant's conviction for conspiracy to commit sexual battery.

First, there is substantial evidence that McClintic and defendant agreed to commit sexual battery on Doe, including that they intended for Doe to be touched sexually without her consent. McClintic testified that he never asked Doe if she was willing to have sex with defendant, nor did he otherwise ask Doe for consent. McClintic testified that the "plan" was for defendant to have sex with Doe, that defendant understood this was the plan, and that defendant "*kn*[*e*]*w she didn't consent*." (Italics added.) Based on this record, there was substantial evidence from which the jury could conclude that McClintic and defendant's conspiracy encompassed a *nonconsensual* sexual touching of Doe.

Second, even assuming there was evidence from which the jury could conclude that defendant agreed to impersonate McClintic in order to sexually touch Doe, we determine that such evidence also supports defendant's conviction for conspiracy to commit sexual battery.

As we set forth above, a defendant commits sexual battery where, among other elements, the touching is "against the will" of the victim. (§ 243.4, subd. (e)(1).) "Against the will" means without the victim's consent. (*Robinson*, *supra*, 63 Cal.4th at p. 208.) For rape and other specified sex crimes, consent means "[t]he person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) In this case, the jury was similarly instructed on consent for purposes of sexual battery pursuant to CALCRIM No. 938: "An act is done against a person's will if that person does not consent to the act. In order to *consent*, a person must act freely and voluntarily and *know the nature of the act*." (Italics added.) (See

10

*Robinson*, *supra*, at p. 209 [Legislature's amendment to sexual battery statute based on an understanding of consent as set forth in section 261.6].) " '*Nature*' means, among other things, 'the *essential character* or constitution of something . . . .' ([Webster's New Internat. Dict. (3d ed. 1966)] p. 1507. )" (*People v. Ogunmola* (1987) 193 Cal.App.3d 274, 279 (*Ogunmola*), italics added; accord, Webster's 3d New Internat. Dict. (1993) p. 1507 [same definition].)

In this case, "[a] juror easily could conclude that the *identity* of the sexual partner is *an essential characteristic* of an act of sexual [touching]." (*People v. Morales* (2013) 212 Cal.App.4th 583, 594, italics added (*Morales*).) The jury could accordingly "find that someone who accomplishes an act of sexual [touching] by impersonating the victim's lover is guilty of" (*ibid*.) sexual battery under section 243.4, subdivision (e)(1), because the victim did not act freely and voluntarily *with knowledge of the nature of the act*. "As one judge explained in an 1884 case arising in Ireland, in which the court affirmed a conviction of rape involving a defendant who impersonated the victim's husband, ' "an act done under the bona fide belief that it is another act different in its essence is not in law the act of the party. . . . The person by whom the act was to be performed was part of its essence." ' [Citations.]" (*Morales*, *supra*, at p. 592.) Consequently, in this case we reject defendant's contention that the sexual battery statute does not encompass the conspiracy that he asserts the evidence reflects in this case, that is, "[t]he agreement described by Mr. McClintic . . . to have . . . sexual relations though the device of an impersonation."

Defendant observes that in *Morales*, the appellate court held that rape within the meaning of former section 261 did *not* include an act accomplished by impersonation of the victim's boyfriend. (*Morales*, *supra*, 212 Cal.App.4th at pp. 586-587.) At the time, former section 261 defined rape as including sexual intercourse by impersonation of only the victim's spouse. Because this provision was expressly limited to the context of a married victim, the *Morales* court felt "compelled" to interpret former section 261 in a

way that did not render this provision superfluous, and accordingly held that "impersonating someone other than a married victim's spouse" did not constitute rape under former section 261. (*Morales*, *supra*, at p. 595.)

In response to *Morales*, the Legislature in 2013 (after defendant's conduct in the instant case), amended the rape statute and three other sex crime statutes that contained a spouse impersonation provision to include the circumstance where the victim "submits under the belief that the person committing the act is someone known to the victim other than the accused, and this belief is induced by any artifice, pretense, or concealment practiced by the accused, with intent to induce the belief." (Stats. 2013, ch. 259, §§ 1, 2; Stats. 2013, ch. 282, §§ 1, 2; §§ 261, subd. (a)(5) [rape], 286, subd. (j) [sodomy], 288a, subd. (j) [oral copulation]; see also § 289, subd. (f) [sexual penetration].) Although the sexual battery statute does not include this language that was added to the other sex crime statutes, the sexual battery statute also does not have a spouse impersonation provision. (See Stats. 2002, ch. 302, § 1.) As a result, we do not believe that the Legislature's failure to include the new impersonation language in the sexual battery statute at the same time it amended the other sex crime statutes containing the spouse impersonation provision necessarily evidences a legislative intent that a sexual touching committed by impersonation does not constitute a sexual battery within the meaning of section 243.4.

Defendant next observes that the sexual battery statute proscribes sexual touching by a defendant when the victim is "unconscious of the nature of the act" because the defendant "fraudulently represented that the touching served a *professional purpose*." (§ 243.4, subd. (c), italics added; see also §§ 261, subd. (a)(4)(D) [rape], 286, subd. (f)(4) [sodomy], 288a, subd. (f)(4) [oral copulation], 289, subd. (d)(4) [sexual penetration].) According to defendant, the Legislature intended that only this specific form of fraud in the inducement would be deemed to vitiate consent.

At common law, there is a distinction between fraud in fact, which is deemed to vitiate consent, and fraud in the inducement, which is deemed not to do so. (*Robinson*,

12

*supra*, 63 Cal.4th at p. 208.)  " 'Fraud in the fact occurs when the defendant obtains the victim's consent to perform one act, but instead engages in another act.  [Citations.]  In that situation, consent is absent, . . . because the victim never agreed to the particular act complained of.  [Citation.]  [¶]  By contrast, fraud in the inducement takes place when the defendant makes misrepresentations to the victim in order to get her consent for a particular act, and then proceeds to carry out that very act.  [Citations.]  In that situation, courts have historically been reluctant to impose criminal liability on the defendant since the victim consented to the particular act performed, albeit under false pretenses.  [Citation.]'  [Citations.]"  (*Morales*, *supra*, 212 Cal.App.4th at p. 591.)

Consequently, "under the common law, perpetrators of sexual offenses by way of fraud in the inducement escaped punishment."  (*Robinson*, *supra*, 63 Cal.4th at p. 209.)  By way of contrast, in "*Ogunmola*, a gynecologist who raped his victims during pelvic examinations was guilty under a fraud in fact theory.  His victims consented to pelvic examinations, not sexual intercourse, and did not realize the 'nature of the act' until it had already occurred.  [Citation.]  Conversely, in *Boro* [*v. Superior Court* (1985) 163 Cal.App.3d 1224,] the defendant tricked his victim into having intercourse as a treatment for disease.  The victim consented to an act of intercourse, accepting Boro's representation that it served a medical purpose.  [Citation.]  The court held that Boro committed only fraud in the inducement, and therefore was not guilty of rape.  [Citation.]"  (*Id.* at pp. 208-209.)[3]

In response to some of the outcomes under common law, "the Legislature has refined the consent requirements for sex crimes to include not only the ordinary

---

[3] The issue of whether sexual intercourse accomplished by impersonation constitutes fraud in the fact or fraud in the inducement is an issue that has "vexed courts for more than a hundred years."  (*Morales*, *supra*, 212 Cal.App.4th at pp. 591-592.)  Even California courts "have been inconsistent when characterizing sex crimes involving impersonation."  (*Id.* at p. 592.)

circumstance where consent is never given, but also more complicated circumstances where it is obtained through deceit." (*Robinson*, *supra*, 63 Cal.4th at p. 210.) Regarding the statutory amendments proscribing misrepresentation of professional purpose, the proponents of the legislative change were "motivated by incidents in which patients were sexually abused under the guise of medical treatment, [and] wanted to ensure that 'sex offenses committed by fraudulent inducement involving a purported professional purpose can be prosecuted.' " (*Id.* at p. 209.)

Thus, it appears the Legislature addressed the particular circumstance of a sexual touching accomplished by a fraudulent representation of professional purpose because of incidents that arose in that context and the common law rule regarding fraud in the inducement. Defendant does not cite to anything in the legislative history of the sexual battery statute or any other sex crime statute suggesting that the Legislature intended to *permit* fraud in other circumstances, such as the circumstance of a sexual touching accomplished by impersonation. To the contrary, as we have explained in the context of the rape statute, the Legislature recently amended various sex crime statutes to prohibit certain sexual acts accomplished by impersonation. Moreover, as we explained, the jury could reasonably conclude that a victim has not given consent within the meaning of section 243.4, subdivision (e)(1), absent knowledge of the identity of the person touching her, and thus defendant's agreement to impersonate someone else in order to sexually touch the victim could reasonably be found by the jury to constitute a conspiracy to commit sexual battery.

In sum, we determine that substantial evidence supports defendant's conviction for conspiracy to commit sexual battery.

**B.** *Destroying or Concealing Evidence*

### 1. Due process

Defendant first contends that his conviction under former section 135 for destroying or concealing evidence, based on his deletion of text messages from his cell

14

phone before being interviewed by the police, must be reversed. He argues the statute did not provide fair warning that such conduct is prohibited, and thus due process prevents its application in this case. The Attorney General responds that former section 135 applies to text messages based on the plain meaning of the statute, particularly its reference to a "record," "instrument in writing," or "other matter or thing."

"[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' [Citation.] The rule of fair warning consists of 'the due process concepts of preventing arbitrary law enforcement and providing adequate notice to potential offenders' [citation], protections that are 'embodied in the due process clauses of the federal and California Constitutions. [Citations.]' [Citation.] The vagueness doctrine bars enforcement of ' "a statute which either forbids or requires the doing of an act in terms so vague that men [and women] of common intelligence must necessarily guess at its meaning and differ as to its application." [Citation.]' [Citation.] A vague law 'not only fails to provide adequate notice to those who must observe its strictures, but also "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." [Citation.]' [Citation.]" (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*).)

However, "[t]he root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." (*Colten v. Kentucky* (1972) 407 U.S. 104, 110.) "Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his [or her] contemplated conduct is proscribed. [Citation.]" (*United States v. National Dairy Products Corp.* (1963) 372 U.S. 29, 32-33, accord, *People v. Townsend* (1998) 62 Cal.App.4th 1390, 1400-1401.) The "prohibition against excessive

15

vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.' [Citation.] Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. [Citations.] All the Due Process Clause requires is that the law give sufficient warning that men [and women] may conduct themselves so as to avoid that which is forbidden." (*Rose v. Locke* (1975) 423 U.S. 48, 49-50, fn. omitted.)

"In deciding the adequacy of any notice afforded those bound by a legal restriction, we are guided by the principles that 'abstract legal commands must be applied in a specific *context*,' and that, although not admitting of 'mathematical certainty,' the language used must have ' "*reasonable* specificity." ' [Citation.]" (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) " ' "A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language." [Citation.] It will be upheld if its terms may be made reasonably certain by reference to other definable sources.' " (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 139.) "Definable sources" include "judicial decisions and common law [citations], legislative history, and other portions of the legislation. [Citations.] Finally, and sometimes most importantly, common sense is also to be considered. [Citations.]" (*Ibid.*)

Former section 135 was enacted in 1872 (*People v. Fields* (1980) 105 Cal.App.3d 341, 346 (*Fields*)) and continued unchanged through the time of defendant's deletion of text messages in 2012. As originally enacted and at the time of defendant's conduct, former section 135 stated: "Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a

16

misdemeanor." Section 135 thus encompasses the destruction or concealment of a "record."

We believe the reference to a "record" in former section 135 provides fair warning that a text message on a cell phone is covered by the statute.

First, the commonly understood meaning of "record," as reflected in the dictionary, encompasses text messages on a cell phone. (See *People v. Victor* (1965) 62 Cal.2d 280, 299 [dictionary definition may reflect the common understanding of a word].) The verb "record" means "to set down in writing," "make a written account or note of," "furnish written evidence of," or "put into written form." (Webster's 3d New Internat. Dict. (1993) p. 1898.) The noun "record" includes "the state or fact of being recorded," "something . . . on which a record has been made," and "evidence, knowledge, or information remaining in permanent form." (*Ibid.*; see *Cedars-Sinai Medical Center v. Superior Court* (1993) 12 Cal.App.4th 579, 585, fn. 4.) The text messages between defendant and McClintic on defendant's cell phone were communications that were "set down in writing," were "a written account . . . of" their communications, and were communications "put into written form." (Webster's 3d New Internat. Dict., *supra*, at p. 1898.)

Second, "[t]he purpose of section 135 is to prevent the obstruction of justice." (*People v. Hill* (1997) 58 Cal.App.4th 1078, 1089 (*Hill*).) The statute has been broadly construed "to encompass an unending variety of physical objects" (*Fields, supra,* 105 Cal.App.3d at p. 345) in addition to writings, based on the statute's reference to "other matter or thing" (former § 135). We discern no basis in the statute for distinguishing between the destruction or concealment of text messages and other forms of writings. Given that the broad language of the statute clearly encompasses writings in a variety of forms (in addition to other items), and the absence of any argument by defendant that the Legislature intended to prohibit the destruction or concealment of certain types of

17

writings but not others, we believe that no reasonable distinction can be made between text messages and the other types of writings encompassed by the statute.

Defendant points to the fact that section 135 was amended after his conduct in this case, effective January 1, 2016, to state: "A person who, knowing that any book, paper, record, instrument in writing, *digital image, video recording owned by another*, or other matter or thing, is about to be produced in evidence upon a trial, inquiry, or investigation, authorized by law, willfully destroys, *erases*, or conceals the same, with the intent to prevent it *or its content* from being produced, is guilty of a misdemeanor." (Italics added.) According to defendant, the amendment reflects that the Legislature read the "prior version of section 135 in the same manner as [him]."

We are not persuaded by defendant's argument. The Legislature's amendment of the statute to expressly refer to a "digital image" and a "video recording owned by another" does not compel the conclusion that the prior version of the statute did not encompass a *writing* such as a text message that is recorded on a cell phone. As we have explained, the statute clearly encompasses written communications in various forms, such a book, paper, or instrument in writing, and a text message on a cell phone is similarly a "record" encompassed within the meaning of the statute. (Former § 135.)

In sum, we believe that former section 135 provided fair warning that the destruction or concealment of text messages on a cell phone was proscribed.

## 2. Destruction or concealment

Defendant contends that he did not destroy or conceal the text messages within the meaning of former section 135. He argues that the text messages continued to exist on McClintic's cell phone and "on servers beyond the reach of either sender or recipient," and the text messages were in fact introduced at trial. Defendant also argues that his deletion of text messages from his cell phone did not delay or obstruct the police investigation. Defendant contends that although the evidence might have supported a

18

charge of *attempted* destruction or concealment (see § 664), this separate offense was not charged.

The Attorney General responds that defendant concealed the text messages within the meaning of the statute, because his conduct interfered, impeded, or frustrated the police investigation. In particular, defendant initially denied to the police that he received texts from McClintic and denied involvement in the conspiracy. According to the Attorney General, "[t]he absence of the texts on [defendant's] cell thus supported [his] defense that he was not involved which frustrated police efforts to determine the true facts surrounding the offense."

As set forth above, former section 135 provides that any person who "willfully *destroys* or *conceals*" a record "with intent thereby to prevent it from being produced, is guilty of a misdemeanor." (Italics added.) In *Hill*, *supra*, 58 Cal.App.4th 1078, this court distinguished between destroying, concealing, and attempting to destroy or conceal evidence as follows.

"The plain meaning of 'destroy' is to ruin something completely and thereby render it beyond restoration or use. (See Webster's New Internat. Dict. (3d ed. 1981) p. 615.) Under this definition, if one destroys evidence, it necessarily becomes unavailable and cannot be produced. Conversely, if, despite one's efforts, the evidence is or can be restored and used, then, by definition, it has not been destroyed; rather, such efforts constitute an attempt: a direct, but ineffectual, act toward the commission of a crime. [Citations.] [¶] . . . Together, the statute and the proscription against attempts (§ 664) reach any and every direct act taken to destroy evidence committed with the requisite intent, regardless of whether the acts succeed. This construction also maintains a clear line between committing and attempting to commit the offense by acts of destruction." (*Hill*, *supra*, 58 Cal.App.4th at p. 1089.)

In *Hill*, the "defendant tore the checks and tossed them from the car with the intent to prevent them from being produced. However, he did not ruin them completely or

19

render them beyond restoration or use.  Indeed, they were easily reassembled and admitted into evidence at trial, and thus were no less useful for having been torn.  Thus, there [was] insufficient evidence to support his conviction on the theory he destroyed the checks.  At most, the tearing of checks was an attempt to destroy them." (*Hill*, *supra*, 58 Cal.App.4th at pp. 1089-1090.)

This court in *Hill* then turned to the meaning of "conceal."  This court explained: "The word 'conceal' simply means to hide or cover something from view.  (Webster's New Internat. Dict., *supra*, at p. 469.)  [Former] [s]ection 135 proscribes concealing evidence 'about to be produced in evidence upon any trial, inquiry, or investigation.'  Given its plain meaning, 'conceal,' in context, does not necessarily or reasonably suggest that a defendant must render evidence permanently unseen, or . . . unavailable.  Rather successful concealment of evidence from a particular investigation is sufficient." (*Hill*, *supra*, 58 Cal.App.4th at p. 1090.)

This court explained that "conceal" must be viewed "in context and in light of the purpose of the statute.  One can obstruct the administration of justice in varying degrees and in a variety of ways.  Obviously, to permanently conceal evidence is a substantial obstruction of justice.  To a lesser degree is any act of concealment that interferes with, impedes, frustrates, or unnecessarily prolongs a lawful search." (*Hill*, *supra*, 58 Cal.App.4th at p. 1090.)

This court provided the following example:  "[A] thief eludes the police and buries his booty in a neighbor's backyard.  Police arrive and search him and his property but find nothing.  The next day, a neighbor leads them to freshly tilled earth in his yard, and they dig up the stolen property.  Has the thief violated the statute or merely attempted to do so?  Given the ordinary meaning of 'conceal,' the purpose of the statute, and its applicability to any investigation, the thief has, in our view, violated the statute:  his conduct successfully hid stolen property from view during the first search of him and his

property and thereby impeded, frustrated, and prolonged an investigation of the theft." (*Hill*, *supra*, 58 Cal.App.4th at p. 1090, italics omitted.)

This court further explained that, "where a thief does not *interfere with, impede, frustrate, or prolong a lawful investigation*, for example, where a thief is interrupted while concealing evidence or where the police watch him conceal it, he has not successfully hidden the evidence or appreciably affected an investigation and thereby obstructed justice. He has merely tried to do so. Thus, his conduct constitutes an attempt to violate the statute by concealment." (*Hill*, *supra*, 58 Cal.App.4th at p. 1090, italics added.) This court thus stated that the "line between committing the offense and attempting to do so by concealment" is "whether the act of concealment *appreciably interfered with an investigation, inquiry, or trial and thereby obstructed justice*." (*Id.* at p. 1091, italics added.)

Turning to the facts before it in *Hill*, this court stated: "In full view of the police, defendant abandoned the torn checks by throwing them from the car. Clearly, he did not succeed in hiding or covering this evidence; nor did he appreciably affect the investigation of suspected counterfeiting. An officer simply walked over to the discarded evidence and collected it. Thus, there is insufficient evidence to support defendant's conviction on the theory he concealed the checks. At most, abandoning them in front of the police was an attempt to conceal them." (*Hill*, *supra*, 58 Cal.App.4th at p. 1091, fn. omitted.)

In this case, outside the presence of law enforcement, defendant deleted from his cell phone the text messages with McClintic. By the time of defendant's interview with Officer Richardson, the officer had already seen on McClintic's phone the text messages that the officer believed were between defendant and McClintic. However, during defendant's interview, he allowed the officer to look through his phone and the officer did not see the text exchanges with McClintic. Defendant also initially denied having any text communications with McClintic. At one point, when the officer read from a

21

notepad the text messages he had gotten from McClintic's phone, defendant denied that the officer was telling the truth and denied receiving the texts or knowing what they were about. Ultimately, defendant indicated that he had deleted the texts from McClintic prior to going to the police department.

Based on this record, we believe there is substantial evidence to support defendant's conviction under former section 135 for concealing evidence. Defendant's earlier deletion of the text messages from his cell phone outside the presence of law enforcement supported his later assertion to Officer Richardson that he did not have any text communications with McClintic. At that point in the investigation by law enforcement, the jury could reasonably conclude that the evidentiary value of the text messages on McClintic's cell phone was not the same as if those text messages were also on defendant's cell phone. If defendant's cell phone contained the same text messages, it would have clearly established that McClintic and defendant had been communicating, rather than leaving open the possibility that McClintic had actually been communicating by text with someone else. Indeed, the absence of the text messages on defendant's phone supported defendant's assertions to Officer Richardson that he did not receive the text messages or otherwise know about them. The officer continued questioning defendant about the text messages until defendant ultimately admitted that he had deleted text messages prior to arriving at the police department. The jury could reasonably conclude that the officer had to conduct a further investigation or inquiry, by way of the officer's continued questioning of defendant until his admission that he had deleted text messages or by other means to verify that the text messages on McClintic's cell phone were actually communications with defendant on his cell phone, as a direct result of defendant's deletion of the text messages from his own phone. Based on this evidence, the jury could reasonably conclude that defendant's deletion of the text messages was an "act of concealment [that] appreciably interfered with an investigation [or] inquiry . . . and thereby obstructed justice." (*Hill*, *supra*, 58 Cal.App.4th at p. 1091.)

22

## IV.  DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
MIHARA, J.

*People v. Montoya*
**H041874**